**WHITE INDUSTRIES, INC., et al., Plaintiffs,**

v.

**The CESSNA AIRCRAFT COMPANY, et al., Defendants.**

**No. 20245–B.**

United States District Court, W.D. Missouri, W.D.

Oct. 2, 1986.

As Amended Oct. 14, 1986.

As Amended March 10, 1987.

Senator Grassley).

Edward A. McConwell, Overland Park, Kan., John A. Cochrane, Stewart C. Loper, St. Paul, Minn., for plaintiffs.

Thomas E. Deacy, Jr., Dale Beckerman, Kansas City, Mo., E. Houston Harsha, Kirkland & Ellis, Chicago, Ill., for defendants.

**ORDER ON DEFENDANTS' MOTIONS FOR INVOLUNTARY DISMISSAL AND TO DECERTIFY CLASS (AS AMENDED BY THE COURT'S ORDERS OF OCTOBER 14, 1986 AND MARCH 10, 1987)**

ROSS T. ROBERTS, District Judge.

White Industries, Inc. ("White Industries") and Carthage Airways, Inc. ("Car-

thage Airways")[1] seek, for themselves and for the members of a nationwide class composed of all "zone dealers" of Cessna aircraft who operated as such during the years between April 14, 1968 and June 5, 1974,[2] treble damages for alleged violations of § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), and § 1 of the Sherman Act, 15 U.S.C. § 1.[3] Still present as defendants are The Cessna Aircraft Company ("Cessna"), and Cessna Finance Corporation ("CFC").

Following assignment to this division, the case proceeded to trial before the court sitting without a jury. During the course of trial, it was determined: (a) that presentation of the individual claims asserted by White Industries and Carthage Airways would be bifurcated between liability and damages; (b) that upon completion of the liability phase of those individual claims the court would recess the case, issue its rulings on evidentiary questions which had been reserved, and thereafter rule defendants' anticipated motion for involuntary dismissal of those claims; and (c), that in tandem with its liability rulings on the individual claims the court would rule defendants' motion—made during trial—to decertify the class. The court's evidentiary rulings having been made, see *White Industries v. Cessna Aircraft Co.*, 611 F.Supp. 1049 (W.D.Mo.1985), I now turn to the substantive matters mentioned.

## I.

### DEFINITIONS

Given the scope and complexity of this litigation, I commence with a definition of certain terms which recur throughout. The exercise, however, is not purely adviso-ry; the definitions which follow also incorporate findings of fact and conclusions of law.

(a) *General Aviation:* As described by Cessna itself, "general aviation" includes

all flying except for commercial airlines and military, encompassing everything from the single-seat aerial application aircraft to a planeload of commuters traveling to major airports for airline connections. It [includes] air taxi trips, busy executives visiting outlying plants, an injured child being airlifted to medical facilities, pipeline patrol, aerial examination of forests for fires, the shipment of high priority cargo, rushing spare parts to equipment requiring immediate service, aerobatics, reseeding strip-mined areas, restocking lakes with fish [and] floatplane hunting and fishing trips into the North Woods. It [includes] almost every conceivable business and recreational use.

Plt. Ex. # 2 (Cessna brochure, *circa* 1969).

(b) *Fixed Base Operator ("FBO"):* A generic term signifying a business (individually owned, corporate, or otherwise) which occupied physical space at an airport and which carried on some or all of a variety of general aviation related activities, including flight training, aircraft rental, aircraft chartering, aircraft maintenance, servicing and repair, aircraft hangaring or tie-down, and the sale of aircraft, avionics, accessories and parts. As would be expected, some FBOs were larger and more aggressive in their operations than others, and some did not engage in all the activities mentioned above. It appears, however, that many were at least occasionally involved in the resale of both new and used aircraft to most kinds of "end consumers"

1. Although one of Carthage Airways' shareholders, Eugene Ingram, is also named as a plaintiff, it is clear that any claims he might assert would pre-date July, 1966, when Carthage Airways was incorporated. Those claims were barred by the applicable four year statute of limitations at the time this suit was filed, see 15 U.S.C. § 15b, and thus will not be considered further.

2. A class composed of all Cessna dealers—zone and contracted (*see* definitions, *infra*)—was originally certified. In August, 1983, my prede-cessor narrowed the class to its present configuration.

3. Plaintiffs' prayer also includes a request for injunctive relief. At some unidentified point before this case proceeded to trial, however, Cessna completed its elimination of the "Cessna distributor" (*see* definitions, *infra*) portion of its distribution network. Since the functioning of that "Cessna distributor" system formed the whole basis for plaintiffs' claims, the request for injunctive relief is now moot.

(see "end consumer," *infra*), and a number were active in that line of business. Both "contracted dealers" of Cessna aircraft (*see* "Contracted Dealer," *infra*) and "zone dealers" of Cessna aircraft (*see* "Zone Dealer," *infra*) were ordinarily FBOs, although many other FBOs were never formally associated with the Cessna distribution system.[4]

(c) *Cessna Distributor:*[5] As used in this opinion, a business operating under a franchise contract with Cessna, performing—at least in theory—a more or less traditional wholesale function in the distribution of Cessna aircraft, accessories and parts: *viz*, the purchase and maintenance of an inventory of Cessna aircraft, accessories and parts; the development of "contracted dealers" (*see* "Contracted Dealer," *infra*) within the distributor's assigned geographic "area of responsibility;" and the sale of Cessna aircraft, parts and accessories to those contracted dealers.

(d) *Contracted Dealer:* As used in this opinion, a business—ordinarily if not without exception an FBO—operating under a contract (ordinarily of one year duration) with a Cessna distributor. A "contracted dealer" was in theory to perform a more or less traditional retail function in the distribution of Cessna aircraft, accessories and parts: *viz*, purchase Cessna aircraft, accessories and parts and resell the same to the buying public. In practice, a "contracted dealer" usually acquired its Cessna aircraft from the Cessna distributor with whom it had a contract, although nothing in any of the contracts shown in evidence required the same or restricted either the distributor or its dealers in buying from or selling to any person either might choose.

(e) *Zone Dealer:* A business—again, ordinarily if not without exception an FBO—operating under a direct contract (ordinarily of one year duration) with Cessna, in theory performing a retail function in the distribution of Cessna aircraft, accessories and parts; a function parallel to that performed by a contracted dealer. As with contracted dealers, nothing in any of the "zone dealer" contracts shown in evidence restricted either Cessna or its zone dealers in buying from or selling to any person either might choose.

(f) *Independent Dealer:* As used in this opinion, a business—usually an FBO—which was not under contract with Cessna or a Cessna distributor, but which engaged (even if occasionally) in purchasing new or used Cessna aircraft for the immediate principal purpose of resale.

(g) *Used Aircraft:* As used in this opinion, any aircraft which at the time of the sale in question carried 100 hours or more of flight time. My present selection of 100 hours of use is based upon the testimony of two of plaintiffs' witnesses (Love and Desciose), but of course is made without prejudice to defendants' ability to show that some lesser number of hours would be appropriate.

(h) *New Aircraft:* As used in this opinion, any aircraft which at the time of the sale in question carried less than 100 hours of flight time, unless materially damaged.

(i) *Current and Non-Current Aircraft:* Cessna marketed each of its models of aircraft on a "model year" basis. Although there were differences from model to model, a "model year" generally commenced in the fall or early winter of each year, and terminated upon the introduction of the new model the following year. The term "current aircraft" refers to an aircraft which, at the time in question, was still within its "model year." By the same token, a non-current aircraft would be any aircraft, even if "new," which at the time in question had been succeeded by the next year's model.

---

4. As noted elsewhere, some FBOs from time to time became "zone dealers" or "contracted dealers" by virtue of entering into the necessary contract with Cessna or a Cessna distributor, and from time to time lost that status by virtue of not renewing the contract.

5. The witnesses and parties have referred to these entities as "independent distributors." I have chosen to substitute the present term in order to avoid any perception or suggestion that there was a relationship between such entities and "independent dealers," *infra*.

(j) *End Consumer:* One who acquired an aircraft for the immediate principal purpose of using it (whether for business or for pleasure), as opposed to reselling it. Thus a commuter airline which purchased a plane for use in that business was an end consumer; so too was an individual who purchased a plane to fly for pleasure, or a company which acquired a plane for executive use. In theory at least, the definition would also include an FBO—even a contracted dealer, zone dealer or independent dealer—which purchased an aircraft, as some did, for the immediate principal purpose of using it in a flight school, air charter service or similar activity.[6]

## II.

### GENERAL BACKGROUND

Cessna was incorporated in 1927. It has been engaged, since that time and insofar as pertinent here, in the manufacture and distribution of aircraft for use in general aviation.

During the period in question (April 14, 1968 to June 5, 1974), Cessna manufactured a variety of models of single and multi-engine aircraft for such use. Those planes were assembled by Cessna at plants in or near Wichita, Kansas—also the location of Cessna's corporate headquarters—and reached the "consuming" public through one of two general distribution systems then utilized by Cessna: (a) the Cessna distributor system; and (b), the zone dealer system. It is the functioning and interrelationship of these two systems which form the core of plaintiffs' claims.

Historically, in the period before and immediately after World War II the Cessna distribution system—like that of other general aviation aircraft manufacturers at the time—was essentially single-tiered, made up of "distributors" who purchased aircraft and parts from Cessna and resold to

"operators." The latter were at that time the predominant end consumers of general aviation aircraft, who used the planes they purchased for flight school training, rentals, charter service and special use work. The "distributors," although called such, generally performed little in the way of traditional "wholesale" functions, and in fact operated in a capacity which would ordinarily be thought of as that of a "dealer" or "retailer."

In the 1950's, Cessna undertook to broaden the market for its aircraft to include more of the general public—those who would purchase for what might be called "personal use" (whether business or pleasure, individual or corporate). To that end, it sought to expand the number of airport based outlets which would bear its name and provide a point of contact with the general public. That effort led to the creation of a more formal, two-tier distribution system composed of Cessna distributors operating under contracts with Cessna, and contracted dealers operating under contracts with those Cessna distributors—the so-called Cessna distributor system. Cessna sold its aircraft to Cessna distributors at a discount of 25% (during some periods, 26%) from Cessna's suggested list price; the suggested "dealer" price was a discount of 20% from the suggested list price.

In general, the original Cessna distributors were the larger and more stable of the earlier "distributors," who converted their operations and entered into appropriate contracts with Cessna; the contracted dealers were either earlier "distributors" who did not convert, or were drawn from the ranks of FBOs. In the event, however, Cessna was unable to obtain and keep a sufficient number of Cessna distributors to service all areas of the country. Cessna sought to fill these voids, where they existed, by the creation of its "zone" distribu-

---

**6.** Defendants advance a suggestion that the use of an aircraft in such activities would amount to a "resale by the hour" (or on whatever other basis the owner's charges were fixed). I feel obliged to reject that idea as a matter of law, however ingenious it may be and even though some of plaintiffs' witnesses agreed with it. So far as I can determine, when the Robinson-Pat-

man Act refers to "resale" it refers to a sale in the conventional sense, as distinguished from "use" or "consumption" (words it also employs). *Compare General Motors Corp.,* 3 Trade Reg. Rep. (CCH) ¶ 22,165, at 23,021 to 23,023 (1984) (a § 2(d) decision, but still applicable here, *see* fn. 10 *infra* ).

tion system. Under that arrangement Cessna established, for each geographic area in need thereof, its own "zone" outlet, responsible for performing in that geographic area the same functions that a Cessna distributor would otherwise have performed. These "zones" were wholly owned divisions of Cessna, but each had its own, separate operating facility and staff and was in general dealt with as a separate "profit center" within the Cessna organization. It was the responsibility of each "zone" to develop and enter into contracts with local "zone dealers." Over the years, Cessna expanded this "zone" method of operation (by buying out Cessna distributors or by implementing the system in areas where Cessna distributors chose not to renew their agreements), until by 1970 substantially over 60% of the company's business was conducted through the "zone" system. Zone dealers acquired their aircraft from Cessna at a discount of 20% from the suggested list price.

In summary, during the period in question the Cessna distribution system was a "dual" system: in some parts of the country planes were sold by Cessna to Cessna distributors, who in theory resold to their contracted dealers, who in turn resold to the buying public; in other parts of the country planes were sold by Cessna through its "zone" outlets to zone dealers, with those dealers reselling to the buying public.

\* \* \*

CFC is, and was during the time in question, a wholly owned Cessna subsidiary which provided wholesale and retail financing to purchasers of Cessna aircraft. It is the source of a good bit of the documentary evidence offered in this case, but aside from whatever tactical advantage may have accrued to plaintiffs in that connection its presence as a defendant is largely unexplained.

\* \* \*

White Industries was incorporated in 1965. In excess of 95% of its stock is and always has been held by Frank Terry White, who is and always has been its President and chief executive officer.

Originally, the company was involved principally in the foreign automobile salvage business, although it also maintained an aircraft rental, aircraft charter, flight instruction and aircraft sales business at Fairfax Airport in Kansas City, Kansas. The assets of the automobile salvage business were sold in 1968, and thereafter the bulk of the company's operations were represented by the above mentioned aircraft related activities, eventually expanded to include the operation of an aircraft commuter service as well.

On August 8, 1968, the company entered into a contract with Cessna and became a Cessna zone dealer (under the "Kansas City zone") for all but one of the models of Cessna single and twin-engine aircraft. The dealership was "non-exclusive" (as were all Cessna dealerships, whether established under a Cessna distributor or under a zone), with an assigned "area of responsibility" consisting of two Missouri counties (Jackson and Clay) and two Kansas counties (Johnson and Wyandotte), all part of the greater Kansas City metropolitan area. The arrangement was continued until December 31, 1969, during which time the company purchased 27 aircraft from Cessna, each at a discount of approximately 20% from Cessna's suggested list price.

\* \* \*

Eugene Ingram is and was at all relevant times a resident of Carthage, Missouri, a Southwestern Missouri community located approximately 150 miles to the south of Kansas City. In July of 1962, Ingram acquired a fixed base operation at the Carthage Municipal Airport. That business had previously been, among other things, a contracted dealer (single engine) under Hackett-Aire Distributors ("Hackett"), a Cessna distributor located in Kansas City. Ingram, operating as a sole proprietorship under the name "Carthage Airways," continued the relationship until 1966, when the business was incorporated under the name "Carthage Airways, Inc."

In approximately 1967, the Hackett distributorship was acquired by Cessna and became the Kansas City "zone" operation. Carthage Airways thereupon entered into a

contract with Cessna and became a zone dealer (single engine). In late 1968, the dealership was expanded to include multi-engine aircraft.

In February, 1969, Carthage Airways acquired a fixed base operation at Miami, Oklahoma, approximately 60 miles to the southwest of Carthage. That Miami operation, carried on under the name "Miami Aircraft," was actually a separate dealership (multi-engine) conducted under a contract with Skyliners Distributors, Inc. ("Skyliners"), a Cessna distributor located in Wichita, Kansas. Carthage Airways continued the "Miami Aircraft" operation for approximately two years.

In 1970 or 1971, the Kansas City "zone" was acquired by DAD Incorporated ("DAD"), a Cessna distributor located in Omaha, Nebraska. Despite that fact, Carthage Airways apparently continued as a single engine Cessna dealer under a separate contract with Cessna until February 4, 1972, although it actually purchased its aircraft from DAD during that time frame. On the latter date, it entered into a dealer (single engine) contract with DAD. This last arrangement continued until Carthage Airways' business ended in 1973.

During the period at issue in this suit, Carthage Airways purchased 23 Cessna aircraft. Those planes, as with the planes purchased by White Industries, encompassed a variety of models extending from the cheapest of Cessna's single engine craft (the Model 150) to sophisticated and expensive twin-engine models (e.g., the Model 421A).

### III.

### STANDARD OF REVIEW

As noted, the individual plaintiffs' claims have been bifurcated between liability and damages. As also noted, those claims have been bench-tried and are presently before me on defendants' motion, pursuant to Rule 41(b), for involuntary dismissal at the close of that individual liability evidence.

Both the language of the Rule and the Advisory Committee comments demonstrate that the standard employed in dealing with such a motion is quite different from that applied to counterpart motions made in jury-tried cases under under Rule 50(a). In the latter instance, of course, the court determines only whether the evidence presented is sufficient to create an issue of fact for the jury; a process that requires viewing the evidence in the light most favorable to the party opposing the motion and prohibits a weighing of the evidence or any assessment of witness credibility. *See generally* 9 Wright and Miller, *Federal Practice and Procedure* § 2524 (1971). With regard to the present sort of motion, however, there are no special inferences applied in favor of the party opposing the motion, *id.* § 2371, at 224–25, and the court may weigh the evidence presented, resolve any conflicts therein and decide for itself where the preponderance lies. *Id.;* and *see Byrd v. Vitek*, 689 F.2d 770, 771 n. 2 (8th Cir.1982); *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 154–55 (8th Cir. 1977); *Lang v. Cone*, 542 F.2d 751, 754 (8th Cir.1976). In short, under a Rule 41(b) motion the court may undertake a full-blown examination of the merits of the claims to which the motion is directed, complete with fact finding and credibility resolutions. If, having made that examination, the court finds that the opposing party has not supported those claims by a preponderance of the credible evidence, the motion should be granted.

### IV.

### THE ROBINSON–PATMAN CLAIM

Reduced to its most prosaic terms, plaintiffs' Robinson-Patman claim is that some or all Cessna distributors sold Cessna aircraft on other than a "wholesale" basis, and in fact sold in direct competition with plaintiffs at the retail level. Because of that, plaintiffs allege, and because of the price advantage Cessna distributors enjoyed in their acquisition of Cessna aircraft—a 25% (or during some periods 26%) discount as against the 20% discount at which Cessna sold its planes to zone dealers (and at which contracted dealers often acquired planes from Cessna distributors)

—plaintiffs have been, in Robinson-Patman vernacular, the victims of discrimination by Cessna in the price charged "different purchasers [Cessna distributors vs. zone or contracted dealers] of commodities of like grade and quality [the aircraft in question] ... where the effect of such discrimination may be substantially to lessen competition ... in any line of commerce, or to injure ... competition with any person who ... knowingly receives the benefit of such discrimination [the Cessna distributors]...." *See* 15 U.S.C. § 13(a).[7]

As the Supreme Court has observed, "the Robinson-Patman amendments by no means represent an exemplar of legislative clarity." *FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968). Nonetheless, the constituent elements of § 2(a) are not difficult to identify, even if they are not always easy to apply. According to the Federal Trade Commission:

> In order to bring the substantive portions of [§ 2(a) of] the Act into play, there must be (1) two or more consummated sales, (2) reasonably close in point of time, (3) of commodities, (4) of like grade and quality, (5) with a difference in price, (6) by the same seller, (7) to two or more different purchasers, (8) for use, consumption, or resale within the United States or any territory thereof, (9) which may result in competitive injury. Furthermore, (10) the "commerce" requirement must be satisfied. All ten of these jurisdictional elements must be met in order to invoke the power of the Federal Trade Commission or the courts to consider the lawfulness of pricing transactions.

*International Telephone & Telegraph Corp.*, 3 Trade Reg. Rep. (CCH) ¶ 22,188, at 23,090–91 (1984). Further (and finally), in any claim for damages a plaintiff must also meet the "actual injury" requirement of § 4 of the Clayton Act, 15 U.S.C. § 15. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561–62, 101 S.Ct. 1923, 1926–27, 68 L.Ed.2d 442 (1981).

Defendants suggest that plaintiffs' case fails in connection with several of these elements. Specifically, defendants assert: (a) that plaintiffs have failed to meet the "like grade and quality" requirement with respect to aircraft purchased by them, as compared to aircraft purchased within a "reasonably close" time frame by any alleged competing Cessna distributor; (b) that plaintiffs have failed to satisfy the "in commerce" requirement with respect to any sales to them, or any sales to a Cessna distributor; (c) that plaintiffs have not shown themselves to be in "competition" with any Cessna distributor; and (d), that plaintiffs have failed to show any actual injury within the meaning of § 4 of the Clayton Act. In addition, defendants suggest that portions of Carthage Airways' claim are time-barred. To the extent necessary to reach them, these and certain related issues will be addressed below, *seriatim.*

## A.

### *The Relevant "Commodities"*

As concerns purchases by the plaintiffs and by Cessna distributors, the relevant "commodities" would be either new or used (as sold by Cessna)[8] aircraft, *purchased for resale.* Although dealers (and other

---

7. Section 2(a) of the Act, 15 U.S.C. § 13(a), as immediately pertinent, reads as follows:
It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of

such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

8. While Cessna ordinarily sold new aircraft, it also occasionally sold "factory demonstrator" or "zone demonstrator" aircraft. Presumably those aircraft would often be "used," as that term has been defined in this opinion.

FBOs) sometimes purchased aircraft (new or used) for *use* in their businesses (flight school, air charter service, etc.), no one has asserted that pricing differentials by Cessna had any impact upon competition in those endeavors, even if I make the assumption that such "business use" competition falls within the Act.[9] Nor can a purchase *for use*, albeit with the idea of resale when sufficient use has been made, be considered a purchase for resale. *General Motors Corp.*, 3 Trade Reg.Rep. at 23–023.[10] Accordingly, while I do not suggest that plaintiffs' claims are adversely affected by their use of planes purchased from Cessna *if they purchased those planes for the immediate principal purpose of reselling them, and if their ability to resell them was adversely impacted by Cessna's differential pricing policies, in turn leading to use in order to mitigate loss*, the "commodities" in question here are in fact limited to aircraft purchased for resale.

In that connection, Frank Terry White testified that all of the aircraft purchased by White Industries in its capacity as a zone dealer were purchased for the purpose of resale. While more elaboration would have been helpful, and while the company did use some of those aircraft in other facets of its business after they remained unsold for a period of time, I find this testimony sufficient for the present purpose. The same is true with respect to Carthage Airways; in fact, the evidence there was in some respects more explicit. And, of course, Cessna distributors ordinarily purchased only for the purpose of resale. I thus find that all parties immediately involved meet the requirement set forth above.

### B.

### *"Like Grade and Quality"*

"Airplanes," as plaintiffs' counsel once said (somewhat unfortunately it might seem), "are not like hotdogs sold at a ballgame." And therein lies the nub of the parties' argument over § 2(a)'s "like grade and quality" requirement.

Section 2(a) demands, generally speaking, not only that there be contemporaneous[11] "actual sales"[12] of the relevant

9. Some commentators have apparently viewed § 2(a) as limited to purchases made for the purpose of resale or distribution. *See* III Kintner and Bauer, *Federal Antitrust Law* 299 (1983); 5 Von Kalinowski, *Antitrust Laws and Trade Regulation* 30–44 (1986). The statute, however, uses the words "use, consumption, or resale...." I can certainly see that a purchase of salt for "consumption" or "use" by a family does not implicate "competition" at the purchaser's level; but a business "use" and perhaps even a business "consumption" might arguably be something else again. The point, however, is academic as far as this case is concerned, for the reasons stated in the text.

10. *General Motors Corp.* is a decision under § 2(d) of the Act. That section is rather clearly limited to situations involving the *resale* of products, *see General Motors Corp.* at 23,021 and authorities cited; and of course the ruling in the case was made in that context. It is, as noted in fn. 9, *supra*, less clear that § 2(a) is limited in that fashion. Whatever the theoretical boundaries of § 2(a) may be, however, I am, for the reasons pointed out in the text, concerned only with aircraft which were purchased for resale, and I thus believe *General Motors* is applicable—and persuasive—authority on the present point.

11. *See generally* III Kintner and Bauer, *supra* § 21.17; 4 Von Kalinowski, *supra* § 24.03[3].

In this case, where Cessna's pricing for aircraft generally remained the same throughout the current model year for each model of aircraft; where no one suggests that the price differential in question was related in any fashion to the time of sale by Cessna; where planes often were not sold for several months after their acquisition by a dealer; and where there is no indication that customer preference was affected by any time factor other than that of current model year, I find as a general matter that all sales of the same model aircraft, made within the current model year for such aircraft, would meet the "contemporaneous sales" requirement. Obviously, however, the timing of a given aircraft purchase might directly impact a plaintiff's ability to show actual injury caused by a Cessna distributor's alleged sale "in competition" with that plaintiff, as where the distributor's sale preceded the plaintiff's purchase.

12. *See, e.g., Tri-State Broadcasting Co. v. United Press Int'l, Inc.*, 369 F.2d 268, 269–70 (5th Cir. 1966) (transfer under an agency or consignment agreement not a "sale"); *L & L Oil Co., Inc. v. Murphy Oil Corp.*, 674 F.2d 1113, 1120–21 (5th Cir.1982) (refusal to deal not a "sale"); *Export Liquor Sales, Inc. v. Ammex Warehouse Co.*, 426 F.2d 251, 252 (6th Cir.1970), *cert. denied*, 400 U.S. 1000, 91 S.Ct. 460, 27 L.Ed.2d 451 (1971) (lease not a "sale"); *South End Oil Co. v. Texaco, Inc.*, 237 F.Supp. 650, 652 (N.D.Ill.1965) (offer to sell not a "sale").

"commodities," but also that the commodities thus sold be of "like grade and quality." Although a different test has been applied where the commodities are sold to purchasers for use in a manufacturing process, *see, e.g., Bruce's Juices, Inc. v. American Can Co.*, 87 F.Supp. 985, 987 (S.D.Fla. 1949), *aff'd*, 187 F.2d 919 (5th Cir.1951), *modified on other grounds*, 190 F.2d 73 (5th Cir.1951), *cert. dismissed*, 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 657 (1951) (applying substitutability or functional interchangeability as a key test), and where identical products are sold under a nationally advertised label and a private label, *see, e.g., FTC v. Borden Company*, 383 U.S. 637, 640, 86 S.Ct. 1092, 1095, 16 L.Ed.2d 153 (1966) (consumer preference irrelevant), in the more ordinary case, where the commodities are destined for resale to the consuming public in an unchanged form and where the focus of the dispute concerns whether those commodities are sufficiently different (even if the seller's cost is the same) to warrant differential pricing, the test is said to be whether there is any "genuine physical difference [between the commodities], regardless of magnitude, that is not merely decorative, artifical or fanciful and which affects consumer use, preference or marketability." 4 Von Kalinowski, *supra* § 25.02[2], at 25.18, and authorities cited; and *see also* III Kintner and Bauer, *supra* §§ 21.19, 21.20, 21.21.

The problem is that the instant case is not an ordinary case. First, and in contrast to most reported § 2(a) cases, it involves highly complex products which are offered (and sold) with a wide variety of "optional" equipment. Second, the pricing differential at issue—the difference in the functional discounts allowed to zone dealers on the one hand and to Cessna distributors on the other—was wholly unrelated to any physical differences between those aircraft or their optional equipment. That is, while as an abstract matter any two aircraft—unless new aircraft of the same model and year, identically equipped—would obviously be sold by Cessna at different prices, and legitimately so, it is not that fact which generated the price differential in question; any Cessna distributor would *always* pay approximately[13] 5 (or 6)% less for a given plane than a zone dealer, solely as a result of the different functional discounts granted by Cessna.

In these circumstances, plaintiffs suggest, the optional equipment features of the aircraft in question should be ignored, with the result that all planes of a given model (at least all new planes of the same model and year) would be treated as being of "like grade and quality," citing *Moog Industries v. Federal Trade Commission*, 238 F.2d 43 (8th Cir.1956), *aff'd per curiam*, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958), *reh'g denied*, 356 U.S. 905, 78 S.Ct. 559, 2 L.Ed.2d 583 (1958). Defendants dispute *Moog's* applicability and argue instead for an application of the conventional test mentioned above, applied to each plane as actually sold.

I am uncertain how *Moog* itself would dictate the result plaintiffs seek, although I also confess to some uncertainty over just how the case should be interpreted and applied in the present sort of situation. The products in *Moog* (automotive coils, piston rings and leaf springs, each sold as a separate "line" with a number of different items in each such "line") did not involve "optional" equipment, nor as defendants correctly point out were Cessna aircraft sold as a "line," with each purchaser buying the entire "line" (although, in fairness, apparently not all of the purchasers in *Moog* bought all of an entire "line" either).[14] Nevertheless, *Moog* does suggest

---

**13.** The functional discounts granted on equipment, although greater for distributors than for dealers, were different in amount than the discount on the basic aircraft. Accordingly, depending upon how a given aircraft was ultimately equipped for resale, the total discount differential might vary slightly from the five or six percent figure for the basic aircraft.

**14.** Whether *Moog* stands for the proposition that when the price differential is a discount that relates to the entire "line," rather than differences in the items themselves, it is necessary only to find two (or more) competing buyers who have purchased contemporaneously from the "line" (even if the items purchased are different) (the idea that the "line" is itself the "commodity"), or instead whether, even under

at least two general concepts which bear upon the present issue: (a) since the "like grade and quality" language of the Act " 'was designed to serve as one of the necessary rough guides for separating out those commercial transactions insufficiently comparable for price regulation by the statute,' " *Moog*, 238 F.2d at 50, quoting from the *Report of the Attorney General's National Committee to Study the Anti-Trust Laws* 157 (1955), the phrase demands a sensible approach and permits a somewhat flexible application; and (b), where the price differential in question is in fact unrelated to physical differences in the items sold, one should not—at least within certain limits which remain consistent with the other features and general purpose of the Act—allow those physical differences to dictate the answer to the "like grade and quality" issue, even though they otherwise ordinarily would. *See Moog*, 238 F.2d at 49–50.

These two concepts have application here. Given the highly sophisticated nature of the products in question, the wide variety of options available (particularly in multi-engine aircraft) and the relatively small number of product sales, defendants' argument would make it virtually impossible to apply the Act to the general aviation aircraft sales industry—or to any other industry involving sophisticated products sold with options—despite the fact that the discounting practice in question, if plaintiffs' allegations concerning its effect are true, is something the Act was clearly intended to prevent. In view of the Act's general prophylactic nature, *J. Truett Payne Co.*, 451 U.S. at 561, 101 S.Ct. at 1926, and the fact that it was obviously

intended to apply (in a general sense) to the length and breadth of domestic sellers and purchasers, I am unwilling to concede such a gap in its practical reach. Further, the evidence demonstrates that many optional items could be readily removed or replaced or (conversely) ordered and installed by the dealer or by someone in the dealer's area, thus undercutting significantly the idea that optional equipment must inevitably be considered an integral part of an aircraft for the present purpose. Finally, to the extent that the presence or absence of optional equipment actually did affect any given resale, it seems to me a point better dealt with in connection with the "actual injury" requirement imposed by § 4 of the Clayton Act.

■ On balance, I conclude that plaintiffs' ultimate premise is correct: in determining the "like grade and quality" issue in this case, the options sold with a particular aircraft should be disregarded. I find, accordingly, that for purposes of this case all new, current Cessna aircraft of a given model were commodities of "like grade and quality," as were all new, non-current Cessna aircraft of a given model and model year, and, as sold by Cessna, all used aircraft of a given model and year (since Cessna applied the same functional discounts to those aircraft, simply adding an additional discount based on hours of use). I note, however, that used aircraft, even as sold by Cessna, cannot be considered of "like grade and quality" when compared with new aircraft (either current or non-current)—a point that perhaps needs no explanation—and that the same would often if not always be true as between current and non-current aircraft.[15]

*Moog*, it is still necessary that there be at least two competing buyers who have each contemporaneously purchased at least one identical item from the "line," I do not know.

**15.** The evidence makes clear that non-current aircraft did not ordinarily compete with current aircraft at any level: that is, the two were not viewed as equivalents by purchasers, and different prices were charged for each both on sale and on resale. In part, it appears, this was the result of actual physical changes made in aircraft from one model year to the next, and in part was simply the result of buyer perceptions

and preferences. The same point has been noted with automobile sales, although in connection with the Act's "contemporaneous sales" requirement. *See Valley Plymouth v. Studebaker-Packard Corporation*, 219 F.Supp. 608, 610–11 (S.D.Cal.1963). In any event, whether one considers that current and non-current aircraft were commodities not of like grade and quality, or instead simply that Cessna's sales of current and non-current aircraft cannot meet the Act's contemporaneous sales requirement, the end result is the same: such sales will not satisfy the "analogous transactions" rationale that underlies both aspects of § 2(a). *Id.*

## C.

### *The "In Commerce" Requirement*

Although there were exceptions, Cessna ordinarily sold its aircraft to Cessna distributors and to zone dealers on an "f.a.f." ("fly away field") basis from its facilities in Wichita, Kansas. Under that arrangement, a purchaser from Cessna would take possession of the aircraft at the factory in Wichita and at that point assumed both the risk of subsequent loss and the cost of transporting the aircraft to the purchaser's facility. Defendants urge that any sale thus accomplished will fail to meet the "in commerce" requirement of the Act.[16]

It is true that § 2(a)'s "in commerce" language is considerably more restrictive than the broad "effect on commerce" test adopted in Sherman Act cases. *See Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 194–95, 95 S.Ct. 392, 398–99, 42 L.Ed.2d 378 (1974); and *see generally* III Kintner and Bauer, *supra* 146; 4 Von Kalinowski, *supra* § 26.01[2], at 26–6 to 26–14. Essentially, the requirement under the present aspect of § 2(a) is that " 'at least one of the two [or more] transactions which, when compared, generate a discrimination ... [have] crossed a state line,' " *Gulf Oil Corp.*, 419 U.S. at 200, 95 S.Ct. at 401, although it is immaterial which of the relevant transactions meets that test, *see Moore v. Mead's Fine Bread Co.*, 348 U.S. 115, 119, 75 S.Ct. 148, 150, 99 L.Ed. 145 (1954). Despite the superficial plausability of defendants' argument in this connection, however, I believe it overlooks the "flow of commerce" doctrine: a general doctrine of federal law which considerably antedates the Robinson-Patman Act, *see, e.g., Swift & Co. v. United States*, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518 (1905), which in fact forms part of the legislative history of the Act, *see* Representative Utterback's remarks at 80 *Cong.Rec.* .9416 (June 15, 1936),[17] and which clearly may be utilized in meeting the Act's "in commerce" requirements, *see Gulf Oil Corp.*, 419 U.S. at 195, 95 S.Ct. at 398; *L & L Oil Co., Inc. v. Murphy Oil Co.*, 674 F.2d at 1116–17; *S & M Materials Co. v. Southern Stone Co.*, 612 F.2d 198, 200 (5th Cir.1980), *cert. denied*, 449 U.S. 832, 101 S.Ct. 101, 66 L.Ed.2d 37 (1980); *Roorda v. American Oil Co.*, 446 F.Supp. 939, 941–43 (W.D.N.Y. 1978). Under that doctrine, the "flow of commerce" begins when goods are transported from their place of origin, if the movement of those goods is intended or expected to cross a state line (unless the goods are raw materials which are to be physically altered before they cross a state line), and continues until the goods come to rest at their ultimate intended destination in another state or states;[18] all that occurs during that flow is "in commerce" for Robinson-Patman purposes. *See generally* 4 Von Kalinowski, *supra* at 26–38. It is likewise clear that the existence of the flow depends (with the limitations mentioned above) only upon the general fact that the goods are intended or expected to and do in fact cross a state line during the course of the flow; technicalities regarding passage

---

16. There are, as a reading of the section demonstrates, actually three (or four) "in commerce" clauses in § 2(a). *See* III Kintner and Bauer, *supra* 145; 4 Von Kalinowski, *supra* § 26.01. The present question technically relates only to the third such clause, although at least in the present sort of case a satisfaction of that third clause will ordinarily dictate a finding that the other clauses are also satisfied. III Kintner and Bauer, *supra* 145–46; 4 Von Kalinowski, *supra* 26–16.

17. Representative Utterback cautioned that the exemption for purchases in intrastate commerce [i]s not important for practical purposes [since the manufacturer] may not sell to a mass buyer at discriminatory prices for delivery within the State and shipment then to other States, since such sales are, by long-settled law, interstate commerce.

18. Where goods are moved from out of state to an instate wholesaler for redistribution in state, the flow stops when the goods reach that wholesaler, unless the goods were purchased by the wholesaler (a) to fill a specific order; (b) under a contract or understanding by which the wholesaler has agreed to fill the needs of a particular customer; or (c), to fill the anticipated needs of a particular customer even though no contract or understanding to do so exists. *See Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 567–70, 63 S.Ct. 332, 335–36, 87 L.Ed. 460 (1943); *Burke v. Ford*, 377 F.2d 901, 904 (10th Cir.1967), *rev'd on other grounds*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1968); 4 Von Kalinowski, *supra* § 26.02[3][b].

of title, or whether the goods are shipped f.o.b. (or, as in this case, f.a.f.) are essentially immaterial. *S & M Materials Co. v. Southern Stone Co.*, 612 F.2d at 200; and *see also L & L Oil Co., Inc. v. Murphy Oil Corp.*, 674 F.2d at 1116–17; *Vanco Beverages, Inc. v. Falls Cities Industries, Inc.*, 654 F.2d 1224, 1228 (7th Cir.1981), *vacated on other grounds*, 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983).

■ Here, each of the Cessna distributors in question was located outside the State of Kansas.[19] It was obviously clear to all concerned that the aircraft they purchased from Cessna, whether delivered f.a.f. in Wichita or otherwise, would be transported from Wichita to their respective places of business in those other states. No more is necessary for the purpose of § 2(a)'s "in commerce" requirement, and I accordingly reject defendants' argument.

### D.

### *Carthage Airways as a "Purchaser" from Cessna*

As noted, during the years 1971 and 1972 Carthage Airways purchased its aircraft from DAD, a Cessna distributor in Omaha, Nebraska. In addition, Carthage Airways' "Miami Aircraft" operation purchased its aircraft from Skyliners, a Cessna distributor in Wichita, Kansas. Defendants suggest that all such purchases fall outside the scope of § 2(a), since they were not made directly from Cessna.

By conventional analysis defendants' position would be correct, since the case law makes clear that one who does not purchase directly from the alleged discriminatory seller (here Cessna) cannot ordinarily be considered a "purchaser" within the meaning of § 2(a). *See Barnosky Oils, Inc. v. Union Oil Co.*, 665 F.2d 74, 83 (6th Cir.1981); *Hiram Walker, Inc. v. A & S Tropical, Inc.*, 407 F.2d 4, 7 (5th Cir.1969), *cert. denied*, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969); *Klein v. Lionel Corp.*, 237 F.2d 13, 14–15 (3d Cir.1956); and *see generally Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.*, 368 F.2d 679, 691 (8th Cir.1966); III Kintner and Bauer, *supra* at 192; 4 Von Kalinowski, *supra* at 24–40. The only commonly recognized exception is found in the so-called "indirect purchaser" doctrine: where one purchases a manufacturer's goods through a distributor, he may be deemed to have purchased directly from the manufacturer if the latter in fact deals directly with him in promoting the sale of the goods, or exercises control over the terms on which he buys.[20] *See Barnosky Oils, Inc. v. Union Oil Co.*, 665 F.2d at 83–4; *Hiram Walker, Inc. v. A & S Tropical, Inc.*, 407 F.2d at 7–8; and *see generally* III Kintner and Bauer, *supra* at 202–08; 4 Von Kalinowski, *supra* at 24–49 to 24–58. That exception is clearly inapplicable here, since there is no showing that Cessna dealt directly with Carthage Airways in promoting the sale of aircraft, or controlled the prices charged it by Cessna distributors. In truth, the most to be said in this respect is that Cessna's "wholesale"

---

**19.** During the period in question, in fact, *all* Cessna distributors except for one (Skyliners) were located outside the state of Kansas. Plaintiffs apparently make no claim that Skyliners sold in competition with them, or at least have adduced no proof of that fact.

**20.** In contrast to the position taken in *H.A.B. Chemical Co., Inc. v. Eastman Kodak Co.*, 1981–1 Trade Cas. (CCH) § 63,912 at 75,749 (C.D.Cal.1980), I do not consider that "third line" and "fourth line" claims, *see generally Perkins v. Standard Oil Co.*, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), are also an exception to the general rule mentioned above. Those claims are allowed because of § 2(a)'s express reference to discriminatory effects which "may ... injure, destroy or prevent competition with any person who either grants or

receives the benefit of such discrimination, *or [competition] with customers of either of them*" (emphasis added). Under this language, and under the construction given it in *Perkins*, 395 U.S. at 646–47, 89 S.Ct. at 1873–74, claims which involve injury to a "customer" of a disfavored buyer are allowed without regard to the number of sales "levels" that separate the "customer" from the discriminatorily priced sale (or, more precisely, the number of sales levels that separate the favored "customer" from the discriminating seller, III Kintner and Bauer, *supra* at 315 n. 289). Nonetheless, unless the exception noted in the text applies, or some new exception is recognized, both the "favored" sale and the "disfavored" sale must have been made directly by the alleged discriminating seller.

price to those distributors had the practical effect of establishing a "floor" on the resale price imposed by them. That undistinguished fact of life is not a sufficient basis for invoking the doctrine. *Barnosky Oils, Inc. v. Union Oil Co.*, 665 F.2d at 84.

Carthage Airways concedes as much, and instead urges the application of a new and different exception said to be based upon the Supreme Court's holding in *Fred Meyer*, 390 U.S. 341, 88 S.Ct 904.[21] I believe *Fred Meyer* does indeed support—in fact perhaps dictates—the result sought, and accordingly find the argument persuasive.

In that case, suppliers of canned corn and canned peaches sold those products both to the Fred Meyer Company, which operated a chain of supermarkets, and to certain wholesalers who in turn sold to supermarkets which competed with Meyer. Meyer's supermarkets were the beneficiaries of promotional allowances paid by those suppliers; the same allowances were not made available to the wholesalers or to the supermarkets which purchased from them. The Federal Trade Commission found (among other things) that this practice violated § 2(d) of the Act,[22] and entered a cease and desist order barring Meyer from inducing the suppliers to grant promotional allowances which were not available to the wholesalers. *Fred Meyer*, 390 U.S. at 344–47, 88 S.Ct. at 906–08. The Court of Appeals reversed that portion of the order, holding (a) that Meyer and the wholesalers did not themselves compete (since Meyer sold only to the public while the wholesalers sold only to supermarkets), and (b), that the supermarkets which purchased from those wholesalers, and did compete with Meyer, were not "customers"

of the suppliers within the meaning of § 2(d)'s use of that term. *Fred Meyer*, 390 U.S. at 348, 88 S.Ct. at 908.

The Supreme Court in turn reversed. The essence of the holding is captured in the following two quotations, 390 U.S. at 348–49, 352, 88 S.Ct. at 908, 910:

> Respondents press upon us a view of § 2(d) which leaves retailers who buy from wholesalers for the most part unprotected from discriminatory promotional allowances granted their direct-buying competitors. We are told that § 2(d) in specific terms requires this result. To benefit from the statute's requirement of proportional equality, it is urged, a buyer must be a "competing customer" within the narrowest sense of that phrase. Thus, the wholesalers in this case are not competing customers because they do not compete with Meyer, and the retailers who do compete with Meyer in the resale of the suppliers' products are outside the protection of § 2(d) because they are not customers of the suppliers. For reasons stated below, we agree with respondents that, on the facts of this case, § 2(d) reaches only discrimination between customers competing for resales at the same functional level and, therefore, does not mandate proportional equality between Meyer and the two wholesalers. But we cannot accept the second half of this argument, for it rests on a narrow definition of "customer" which becomes wholly untenable when viewed in light of the central purpose of § 2(d) and the economic realities with which its framers were concerned.

> \*   \*   \*   \*   \*   \*

**21.** Plaintiffs also seek to support their argument with a citation to *Perkins v. Standard Oil Co.*, 395 U.S. 642, 89 S.Ct. 1871. *Perkins* simply held, as applied to this case, that there is, in a causal relationship sense, no artificial limit to the number of sales levels which may separate an injured "customer" of a disfavored buyer from a discriminating seller. *See* fn. 20 *supra*. For the reasons stated in fn. 20, I do not believe *Perkins* has any direct bearing upon the present question.

**22.** Section 2(d) reads as follows:

> (d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

Of course, neither the Committee Report nor other parts of the legislative history in so many words define "customer" to include retailers who purchase through wholesalers and compete with direct buyers in resales. But a narrower reading of § 2(d) would lead to the following anomalous result. On the one hand, direct-buying retailers like Meyer, who resell large quantities of their suppliers' products and therefore find it feasible to undertake the traditional wholesaling functions for themselves, would be protected by the provision from the granting of discriminatory promotional allowances to their direct-buying competitors. On the other hand, smaller retailers whose only access to suppliers is through independent wholesalers would not be entitled to this protection. Such a result would be diametrically opposed to Congress' clearly stated intent to improve the competition position of small retailers by eliminating what was regarded as an abusive form of discrimination. If we were to read "customer" as excluding retailers who buy through wholesalers and compete with direct buyers, we would frustrate the purpose of § 2(d). We effectuate it by holding that the section includes such competing retailers within the protected class.

As did the courts in *Julius Nasso Concrete Corp. v. DIC Concrete Corp.*, 467 F.Supp. 1016, 1019 (S.D.N.Y.1979), and *Checker Motors Corp. v. Chrysler Corp.*, 283 F.Supp. 876, 887 (S.D.N.Y.1968), *aff'd on other grounds*, 405 F.2d 319 (2d Cir. 1969), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969), I believe this language rather clearly leads—at least in the circumstances of this case—to the same result with regard to the word "purchaser" as used in § 2(a). Granted, the holding in *Fred Meyer* involves § 2(d) and the word "customer" rather than § 2(a) and the word "purchaser," but those terms, as they appear in their respective sections of the statute, have long been held synonymous,

see *American News Co. v. FTC*, 300 F.2d 104, 109 (2d Cir.1962), *cert. denied*, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962); *Kennedy Theater Ticket Service v. Ticketron, Inc.*, 342 F.Supp. 922, 925 (E.D.Pa. 1972); *K.S. Corp. v. Chemstrand Corp.*, 198 F.Supp. 310, 312 (S.D.N.Y.1961), a holding which certainly seems correct given the similar context in which the two words are used. Nor is the spirit of the two sections essentially different; both seek, within the limits of the statutory language employed, to prevent "'all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power,'" see *Fred Meyer*, 390 U.S. at 349, 88 S.Ct. at 908, quoting from *FTC v. Henry Brock & Co.*, 363 U.S. 166, 168, 80 S.Ct. 1158, 1160, 4 L.Ed.2d 1124 (1960). And certainly an indirect purchaser in the present situation would suffer precisely the same ultimate competitive disadvantage the Supreme Court noted in *Fred Meyer* in connection with § 2(d), unless a similar definition is given the word "purchaser" in § 2(a). In short, if it makes sense to construe the word "customer" in § 2(d) as including an indirect purchaser—and the Supreme Court says it does—it makes equal sense, at least in some situations, to construe the word "purchaser" in § 2(a) in that same way.

I agree that this sort of cross-pollination from *Fred Meyer* should be allowed only with "great caution," III Kintner and Bauer, *supra* 208, so as to avoid consequences unintended by Congress. In the limited circumstances of this case, however, I do not believe an application of the principle in question will produce any such result. Where (as here) a retailer who purchases indirectly claims to be in competition with someone who purchases directly, where (as here) that direct purchaser receives a functional discount predicated upon its claimed status as a wholesaler—a discount not available to the indirect purchaser—and where (as here) the seller in question has notice that its direct purchaser may in fact be competing at the retail level,[23] the seller's options—and duties—

---

**23.** The evidence, in the form of various complaints to Cessna, makes clear that Cessna had such notice, at least as a general matter.

are (or should be) no more or less than where both purchasers buy directly. The suggested answer to the latter problem is one as old as the Act itself: the seller must take reasonable steps to keep advised of the resale activities of those who receive its functional discounts, and where retail selling by one who receives a wholesaler's discount occurs, post-resale price adjustments should be made.[24] *See Sherwin-Williams*, 36 F.T.C. 25, 73–4 (1943); *E. Edelman & Co.*, 51 F.T.C. 978, 988 (1955); Schniderman, *"The Tyranny of Labels"—A Study of Functional Discounts Under the Robinson-Patman Act*, 60 Harv.L. Rev. 571, 601–02 (1947); and *compare Abbott Labs v. Portland Retail Druggists*, 425 U.S. 1, 19–20, 96 S.Ct. 1305, 1317, 47 L.Ed.2d 537 (1976). This is admittedly a burden upon the seller, but it represents the price paid under the Act for maintaining a dual distribution system. The burden would be no greater in the present instance.

■ The problem is by no means easy. All things considered, however, I believe Carthage Airways' suggested application of *Fred Meyer* is appropriate, and I accordingly hold that, as to the aircraft it purchased from DAD and Skyliners, Carthage Airways was in fact a "purchaser" from Cessna within the meaning of § 2(a).

### E.
#### *"Competition"*

With exceptions not pertinent here, it is axiomatic that a seller's differential pricing as between purchasers of a commodity can be a violation of the Robinson-Patman Act only when those purchasers actually compete in the resale or distribution—or perhaps business use—of that commodity, *see National Distillers and Chemical Corp. v. Brad's Mach. Products, Inc.*, 666 F.2d 492, 496 (11th Cir.1982), *reh'g denied*, 673 F.2d 1342 (11th Cir.1982); *M.C. Manufacturing Co., Inc. v. Texas Foundaries, Inc.*, 517 F.2d 1059, 1066 (5th Cir.1975); *Ag-*

*Chem Equipment Co., Inc. v. Hahn, Inc.*, 480 F.2d 482, 490 (8th Cir.1973); III Kintner and Bauer, *supra* 295; 5 Von Kalinowski, *supra* 30–41, 30–50, or would, but for that differential pricing, *see Patman, Complete Guide to the Robinson-Patman Act* 60 (1963). Such purchasers must thus compete both in the geographic sense—that is, in the same relevant geographic market area, *see* III Kintner and Bauer, *supra* 295–98; 5 Von Kalinowski, *supra* 30–41, 30–72—and in the functional sense—that is, at the same functional level in the distribution system for the commodity, *see* III Kintner and Bauer, *supra* 298–99; 5 Von Kalinowski, *supra* 30–48 to 30–64. Accordingly, a determination as to whether two purchasers are "in competition" within the meaning of § 2(a) will involve two separate points of inquiry: (a) an identification of the kinds of customers for which each competes in connection with the commodity in question; and (b), an identification of the geographic area in which each thus competes.

#### 1.
#### *Functional Competition*

The parties have argued at length over whether a Cessna distributor's sales to FBOs should be treated as sales made "in competition" with plaintiffs. Since the term "FBO" does not even necessarily identify a dealer in aircraft, much less what an FBO's immediate principal purpose in purchasing an aircraft might have been, I believe both arguments miss the mark to some extent. As will be seen, however, it is the plaintiffs who ultimately suffer from that fact.

■ I do reject plaintiffs' theory that an aircraft sold by a Cessna distributor to *any* purchaser other than an "authorized Cessna dealer" (defined by plaintiffs as a dealer under current contract with a Cessna distributor or with a Cessna zone) would be (assuming the necessary geographic market factors) a sale made "in competition"

---

**24.** Cessna, of course, had no legal way of controlling the prices charged by Cessna distributors. It could, on the other hand, obviously control the prices which it charged those distrib-

utors. The requirement noted in the text amounts to no more than requiring it to exercise that ability.

with plaintiffs, no matter what the purchaser's reselling function might be. In particular, plaintiffs urge, a sale by a Cessna distributor to an independent dealer, who purchased in order to resell, would be a sale "in competition" with plaintiffs even though that dealer in turn actually competed with plaintiffs in the resale of the aircraft to an end consumer. Plaintiffs take this position despite the fact that their contracts with Cessna (as with all Cessna contracts shown in evidence, both zone dealer and Cessna distributor) clearly specify that the sales rights thereunder are "non-exclusive" (see, e.g., White Industries 1969 contract, Plt. Ex. # 40, page 2 para. 1), and despite the fact, clearly shown by the evidence, that any given independent dealer may have been, in its business operations, indistinguishable from one of the plaintiffs except for the fact that the latter was a party to a Cessna contract for that particular year and the former was not. Indeed, as the evidence shows, that independent dealer may in fact have been an "authorized" Cessna dealer the previous year, or may have become one the next, or both, all with no observable change in its business functioning or functions.

Plaintiffs' theory results, apparently, from an attempt to apply an oft-repeated statement regarding the legality of functional discounts under the Robinson-Patman Act, viz:

Section 2(a) does not exempt functional differentials from its general prohibitions. Such differentials are neither prohibited nor expressly permitted. They must therefore be subjected to the same tests as any other price differences in determining whether they amount to unlawful discrimination in price. The only need for a separate discussion of functional differentials, therefore, is with respect to certain situations in which the granting of such differentials may result in injury to competition. Manufacturers do not ordinarily compete with wholesalers, nor wholesalers with retailers; but it cannot be assumed that differentials as between those classes of customers, granted solely on a functional basis and not justifiable by difference in costs, may not result in injury to competition and be unlawful. If injury to competition results, the fact that the differential was made in good faith on functional grounds is no defense.

Austin, *Price Discrimination and Related Problems Under the Robinson-Patman Act* 50 (rev. ed. 1953); and *see also* I ABA Antitrust Section, Monograph No. 4, *The Robinson-Patman Act: Policy and Law* 54, 59 (1980); Rowe, *Price Discrimination Under the Robinson-Patman Act* 176 (1962); Schniderman, *supra* at 579–88. Such statements in turn suggest that determining the presence or absence of functional competition between purchasers of a commodity is, with reference to any particular kind (in a functional sense) of customer, not so much a process of labeling as simply a factual process of determining whether they both sell the commodity to that kind of customer—a rather straightforward approach I generally accept. *But see* 5 Von Kalinowski, *supra*, at 30–16 n. 35. If that is plaintiffs' theory, however, it encounters an immediate impasse, at least as concerns new aircraft (either current or non-current), since the available evidence fails to show that either White Industries or Carthage Airways ever competed, in any meaningful way, in selling such aircraft to other dealers for resale, and since a dealer (independent or otherwise) who purchases to resell is obviously not the same kind of customer (in a functional sense) as an end consumer. Carthage Airways, for example, never sold *any* plane to a dealer (or an FBO) for any purpose, so far as the evidence shows. Neither did White Industries, insofar as new planes are concerned. Nor does the evidence show that dealers elsewhere customarily sold new aircraft to other dealers (independent or otherwise) for resale,[25] other than perhaps on an ac-

---

**25.** Plaintiffs' offer of some 387 aircraft sales files and sales tickets maintained by Walston Aviation, Inc. (a contracted dealer located in East Alton, Illinois), for the purpose of showing dealer sales to other dealers, falls far short of the mark. In the first place, the available evidence does not in many instances even allow me to find that the purchasers were in fact

commodation basis—something which is the antithesis of a competitive sale.[26] Indeed, if Cessna distributors supplied new aircraft to independent dealers at dealer cost prices as commonly as plaintiffs claim, practical market economics alone would tend to dictate the absence of any real dealer-to-dealer market involving new planes for resale.

The alternative argument, of course, is that plaintiffs were "frozen out" of that market by virtue of Cessna's differential pricing as between Cessna distributors and zone dealers; that plaintiffs wished to compete in that market, and would have done so but for the differential pricing—an approach which might be theoretically acceptable, see Patman, supra; Schniderman, supra 596, but which also poses certain dangers, since the viewer may be led to substitute his own concepts of what "ought to be" for the actual realities of the marketplace. In any event, this approach does require an examination of the parties' functions and functional levels in the distribution of general aviation aircraft, as well as an inquiry into some of the more theoretical aspects of Robinson-Patman policy. When that analysis is performed, the argument flounders.

Plaintiffs urge, in this connection, that it is the independent dealers' status as purchasers which controls, not whether they resell. That suggestion is directly contrary to the law on the subject (much of which plaintiffs freely acknowledge elsewhere in their brief): that one's functional level is determined not by "the character of his buying, but [by] the character of his selling" (emphasis added). Kintner, A Robinson-Patman Primer 154 (1979), quoting from Mennen Co. v. F.T.C., 288 F. 774, 782 (2d Cir.1923); and see Attorney General's National Committee to Study the Antitrust Laws, 1955 Report 204–05 (1955). And, of course, the argument also ignores the fact that independent dealers and "authorized" Cessna dealers occupied precisely the same functional level in the resale of new Cessna aircraft. In fact, if the two were located at the same airport (as was sometimes the case), the ordinary independent dealer would be the direct, primary competitor of the ordinary "authorized" Cessna dealer in all aspects of their respective businesses: flight training, aircraft rental, aircraft charter, aircraft servicing, maintenance and repair, aircraft hangaring and tie-down, new aircraft sales and used aircraft sales.

It has been said that the purpose of the Robinson-Patman Act is to protect competition, not competitors.[27] See Hampton v. Graff Vending Company, 478 F.2d 527, 533 (5th Cir.1973), cert. denied, 414 U.S. 859, 94 S.Ct. 69, 38 L.Ed.2d 109 (1973), reh'g denied, 414 U.S. 1087, 94 S.Ct. 609,

dealers, and I cannot of course simply accept counsel's representation on the point. Second, many if not most of the aircraft involved in these 387 sales were non-current when purchased from Cessna by the various Walston distributors, who in turn made them available to Walston Aviation, Inc. Even if these sales by the latter were to other dealers for purposes of resale the situation appears to have been atypical, resulting from the fact that when Cessna attempted to dispose of its remaining inventory of aircraft following the end of a model year, the Walston distributors customarily purchased the bulk of them. The evidence does not reflect that dealers other than Walston Aviation, Inc. ordinarily dealt to any extent in reselling non-current new aircraft to other dealers for resale, nor, as mentioned, that either White Industries or Carthage Airways did so.

have a plane meeting those requirements, the dealer would call his distributor (or, if a zone dealer, presumably his Cessna zone). If the distributor (or zone) did not have the plane in stock, an effort would be made by the distributor (or zone) to find the plane elsewhere in the system and to acquire it by purchase or trade. Whether this same sort of thing also occurred with any consistency at the dealer level, as is common in the automobile sales business, see Cartrade, Inc. v. Ford Dealers, Etc., 446 F.2d 289, 290–93 (9th Cir.1971), is unknown. In any event, an "accommodation sale" of this nature (involving a search for and acquisition of the only aircraft of a particular sort which can be located with reasonable ease), even if made between dealers, would not be the kind of transaction which demonstrates the existence of a general dealer-to-dealer for resale market.

**26.** A customer sometimes had very particular requirements regarding the plane he wished to purchase. If the dealer he approached did not

**27.** The statement is ordinarily made in addressing a slightly different problem, but I think it has application here, at least in spirit.

38 L.Ed.2d 493 (1973); *Anheuser-Busch v. F.T.C.,* 289 F.2d 835, 840 (7th Cir.1961); Kintner, *supra,* at 117–20; Rowe, *supra,* at 126–32. Perhaps more to the point, it has also been said that

> [i]n short, Congress intended to assure, to the extent reasonably practicable, that businessmen at the same functional level would start on equal competitive footing as far as price is concerned.

*Federal Trade Comm'n v. Sun Oil Co.,* 371 U.S. 505, 520, 83 S.Ct. 358, 367, 9 L.Ed.2d 466 (1963); and *see also Abbott Labs,* 425 U.S. at 12, 96 S.Ct. at 1313. Given these principles, to accept plaintiffs' alternative theory would be to stand the Act on its head. Since independent dealers were plaintiffs' direct competitors in the only new plane resale market in which either actually competed (the end consumer market), to find illegal a Cessna pricing policy which allowed a Cessna distributor to sell new aircraft for resale to both at the same price could only curtail competition, not enhance it. I refuse to apply the Act in that fashion.[28]

The situation with respect to used aircraft, sold as such by Cessna (factory or zone demonstrator aircraft), is more troublesome. There is no question that dealers sold used aircraft to FBOs, including other dealers. White Industries, for example, did so with regard to several planes. It is, however, considerably less clear how frequently such sales were made for the immediate principal purpose of resale, and how frequently factory or zone demonstrator aircraft—which were considered the "cream puffs" of the trade, because of the care given them by Cessna—were involved, at least without a substantial number of added use hours by the selling dealer. And, of course, the same theoretical principles regarding competition, noted above, would apply here as well. I conclude, in these circumstances, that the answer must be the same as for new Cessna aircraft.

All this leaves plaintiffs in a rather awkward position, given their method of proof. As suggested by the preceding passages, for the purposes of ascertaining competition between plaintiffs and any Cessna distributor I will consider only distributor sales to end consumers—i.e., sales to those who purchased for the immediate principal purpose of using an aircraft. Unfortunately, plaintiffs' technique of lumping together all of a distributor's sales to any purchaser other than a contracted dealer of that distributor, usually without further elaboration, does not ordinarily allow me to make that determination.[29] Simply being advised, for example, that Florida Aircraft Distributors ("FAD") (a Cessna distributor in Ft. Lauderdale, Florida) made a sale to "Cam Aircraft" during the relevant time period does not tell me that the sale was to an end consumer (a purchase for use); "Cam Aircraft" may, for all I know, have been a dealer purchasing to resell.[30] Accordingly, unless a given Cessna distributor sale is affirmatively shown to have been an end consumer sale—as where the buyer is shown, directly or by fair inference, to have purchased for use (e.g., a

---

**28.** A much better point for the argument could be made in connection with distributor sales to an independent dealer—or for that matter to *any* dealer, contracted, zone or independent—*for use,* although the result might not be very practical. The point is largely academic, however, since even in those instances where I am able to identify a distributor's purchaser as a dealer of some sort, or even simply as an FBO, the evidence usually does not provide so much as a hint concerning the principal reason for purchase. *See* text *infra.*

**29.** The mere fact that a given sale was a "pass-thru" or "conduit" sale by a distributor—i.e., a sale actually negotiated and consummated by the distributor, but with the chain of title reflecting a sale to a dealer and a resale by that dealer—does nothing to prove the point; the evidence reflects a number of such sales which were made to dealers (independent or otherwise), thus leaving the inquiry where it started.

**30.** Trying to identify the nature of a purchase by virtue of the purchaser's name alone is generally a futile exercise, even though there was testimony that the presence of the word "service" in the name usually signified an FBO. And, of course, merely knowing that a purchaser was an FBO is of no help; not all FBOs bought all their planes for the immediate principal purpose of use. An exception has been made in a very limited number of instances, however, where the name and the accompanying evidence allow a reasonable inference that the purchaser was not involved in any aspect of aircraft sales.

commuter airline's purchase of aircraft suitable for use in that business), or where the buyer is at least shown to have had no connection with the business of reselling aircraft—the sale cannot be used in deciding plaintiffs' claims. The end result is the rather meager collection of sales tabulated in Appendix A.

## 2.
### *"Captive" Dealerships*

■ According to plaintiffs, where a contracted dealer was a wholly owned (or perhaps even partially owned) subsidiary of a Cessna distributor, or where both were owned by a third party, the distributor and the dealer should be classed as a single entity for present purposes, with sales by the dealer treated as sales in fact made by the distributor—"in competition," of course, with plaintiffs. Under the proof here, I am obliged to reject the argument.

The result plaintiffs seek—a disregard of separate corporate entity status—can certainly be accomplished in Robinson-Patman litigation, *see, e.g., National Dairy Products Corporation v. United States,* 350 F.2d 321, 326–27 (8th Cir.1965) (subsidiary and parent treated as same entity for Robinson-Patman criminal liability); *Reines Distributors, Inc. v. Admiral Corp.,* 256 F.Supp. 581, 585–86 (S.D.N.Y.1966) (parent and subsidiary treated as same seller for Robinson-Patman purposes); and *see generally* III Kintner and Bauer, *supra* §§ 21.15, 21.16; 4 Von Kalinowski, *supra* § 24.04[2]; the doctrine is, after all, one of general application. The difficulty here is simply that plaintiffs have generally shown, in this regard, no more with respect to any Cessna distributor and its alleged "captive" dealer(s) than the fact of ownership (i.e., a parent-subsidiary relationship, or ownership of both by some third party), varying degrees of director or officer interlock, and in one instance (FAD, a Cessna distributor, and Sunny South, a dealer, both wholly owned by a third corporation) a sharing of the common parent's accounting services. None of these things—or even all of them together—are sufficient to support the end plaintiffs propose. *See generally Tennessee Valley Authority v. Exxon Nuclear Co.,* 753 F.2d 493, 497 (6th Cir. 1985); *Baker v. Raymond Intern., Inc.,* 656 F.2d 173, 179–81 (5th Cir.1981); *REA v. An-Son Corp.,* 79 F.R.D. 25, 29 (W.D.Okl. 1978); 1 Fletcher, *Cyclopedia Corporations* 472 (Perm. ed. 1983) (all standing for the proposition that "[o]wnership of all the stock of a corporation coupled with common management and direction does not . . . operate as a merger of the two corporations into a single entity," or otherwise permit a disregard of the separate corporate entities, 1 Fletcher, *supra* ). To the contrary, the general rule is that separate corporate entity status can be disregarded only "where [the corporation in question] is so organized and controlled, and its affairs are so conducted, that it is merely an instrumentality, agency, conduit or adjunct of another corporation," 1 Fletcher, *supra;* that is, where there is "such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal," *id.;* and *see also Tennessee Valley Authority v. Exxon Nuclear Co.,* 753 F.2d at 497; *Baker v. Raymond Intern. Inc.,* 656 F.2d at 179–81; *REA v. An-Son Corp.,* 79 F.R.D. at 29.

With one exception, there is no proof that any Cessna distributor "passed on" the benefit of its discount to any "captive" dealer. To the contrary, the testimony was generally that dealings between all distributors and "captive" dealers were carried on at arms length, with no favoritism shown. Except in that single instance, accordingly, there is no reason to depart from the general rule noted above. Since plaintiffs' evidence entirely fails to address the "domination" test posed by that rule, their general argument is without merit.[31] *Compare*

**31.** The evidence does reflect that "Aircraft Finance Company," a separately incorporated Walston company which functioned, on occasion, as a dealer, in fact had no operating facilities or employees of its own. However, even if it is treated as a single entity with its parent on that basis, the ruling does not aid plaintiffs: the parent was Walston Aviation, Inc., another dealer, not a distributor. Nor do I believe the discussion in the text is altered by the fact that

*National Dairy Products Cooperative v. United States*, 350 F.2d at 326–27; *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss Jena*, 298 F.Supp. 1309, 1317–18 (S.D.N.Y.1969), *aff'd*, 433 F.2d 686 (2d Cir.1970).[32]

The single exception noted relates to Walston Aviation, Inc. (the dealer) and the various Walston distributors in the year 1970. In that year, Walston distributors purchased the bulk of Cessna's remaining 1969 model year aircraft (after the end of their model year) at a discount. *See* text *infra* p. 715. The discount, however, was paid in the form of a cash rebate from Cessna and was promptly disbursed in kind among the Walston companies, including the dealership. I am willing to find, on that basis, that sales by the dealership of those aircraft should be treated as sales by the Walston distributors. In view of the isolated nature of this occurrence and the other facts mentioned in the preceding paragraphs, however, there is no reason to expand this to a ruling that all other sales by Walston Aviation, Inc. represent or should be treated as sales by the Walston distributors. Nor does the finding assist plaintiffs' case, even as to those 1970 non-current aircraft sales: neither White Industries nor Carthage Airways ever purchased any new, non-current 1969 aircraft and, as previously noted, their purchase of new, current 1969 aircraft would not have represented "analogous transactions" for purposes of the Robinson-Patman Act.

### 3.

### *Geographic Competition*

■ I also reject, to a large extent, plaintiffs' apparent theory of the geographics of competition in the general aviation aircraft sales industry. According to that theory, at least as advanced at trial (although, oddly, unbriefed here), the relevant geographic market area for any dealer (or Cessna distributor) with respect to any model of aircraft was at least nationwide; that is, every seller, no matter where located in the continental United States, actually and in fact competed with every other seller in the continental United States, in the sale of every sort of Cessna aircraft. The evidence, however, clearly fails to support such a sweeping generalization.

Plaintiffs did not present, for example, the sort of price and price movement relationship analysis which might have been helpful in ascertaining the existence of a single, unitary national market for general aviation aircraft, *see generally* II Areeda & Turner, *Antitrust Law* 351, 355–57 (1978); perhaps because, as their own economist seems to have accepted, an analysis of that type would have tended to show the non-existence of such a market. Instead, plaintiffs rely principally upon the existence of a trade publication of nationwide distribution ("Trade-A-Plane") in which various dealers (Cessna and otherwise) and individuals advertised planes for sale (usually without price quotations, and more often than not in connection with used or non-current aircraft), and upon the opinions of their economist. As to the former, while I can certainly accept that the location and scope of certain types of advertising may furnish some insight into where a given seller actually competes, I cannot accept that advertising of the sort involved in "Trade-A-Plane" in fact demonstrates the existence of a nationwide market for all general aviation aircraft sellers, or even for all of those who advertise therein: such advertising may often be—as plaintiffs' economist admitted—intended to reach or effectual in attracting only those in the advertiser's immediate general location. As to the latter, I note that the economist's opinions on

Walston Aviation, Inc. (the dealer) was actually the parent of the various Walston distributors. In applying the "domination" test, it should make no difference what the respective functional levels of the parent and subsidiary may be.

**32.** I have not overlooked plaintiffs' citations to *Alhambra Motor Parts*, 57 F.T.C. 1007 (1960), *aff'd in part, set aside in part, and remanded*, 309 F.2d 213 (9th Cir.1962), *on remand*, 68

F.T.C. 1039 (1965), and similar "group buying" cases. I do not consider those cases in point: they involve situations where the putative wholesaler was found to be, in substantial part, nothing more than a passive "front" for the group buyers, and in addition usually reflect a consistent partial pass-thru of the wholesaler's discount to those group buyers. Those are not the facts of this case.

the subject were based upon the fact of "Trade-A-Plane" advertising (despite his above-mentioned admission), coupled with an assumption that ads therein by certain sellers, even though ordinarily unaccompanied by price quotations, would in some unexplained fashion generate nationwide price standards;[33] upon the location of sales by certain contracted dealers and Cessna distributors without distinguishing between the two; and upon reading "the testimony [of others who] treat the market as being a single market for a particular model plane," although no more factual support is shown in the record for the opinions of those others than is shown for the opinions of the economist himself, and even though the testimony of plaintiffs and other witnesses suggests just the opposite. I am thoroughly unpersuaded.

Unfortunately, plaintiffs' reliance upon their theory, and upon their expert in support of it, has left them with very little real proof on this subject. The evidence which does exist suggests that a number of factors impact the matter, including the population density of the area in which the seller is located (the more sparsely populated that area, the greater the likely radius of the actual marketing area), the model and cost of the aircraft (e.g., the more expensive aircraft generally involve buyers who are willing, because of economies of scale in connection with cost, to travel greater distances to shop), the flying range of the aircraft (a factor that affects, among other things, the distances the seller is willing to take the aircraft for demonstration purposes), the particular seller's advertising and other merchandising efforts, and matters of buyer convenience (some rather peculiar to the general aviation industry). In short, it is not possible, at least on the evidence before me, to generalize fairly with respect to all sellers and all aircraft—except to reiterate that plaintiffs' "nationwide" theory is clearly unacceptable.

Insofar as White Industries is concerned, I find that the company's actual, effective geographic market area with respect to single engine aircraft, at least as a sort of composite for all models thereof, extended a distance of approximately 150 miles from the company's location at Fairfax Airport, Kansas City, Kansas—somewhat less, perhaps, for Model 150 aircraft, slightly more, perhaps, for Model 182 aircraft. This is admittedly an approximation, but appears reasonable given the area in which White Industries actually sold single engine aircraft (a maximum distance of 100 miles), the maximum distance covered by the company's mailings (150 to 250 miles) and demonstration flights (ordinarily within 200 miles on single engine aircraft), and the testimony of other witnesses (Hoster, Cox, Hunt; *but see* DeScoise) who offered generalized estimates of geographic trade or market areas. For the time being at least, I will also use the same figure to designate the single engine aircraft trade area enjoyed by Carthage Airways (calculated separately for aircraft at its Carthage, Missouri and Miami, Oklahoma locations), although I do so with less confidence since the record contains little information about that company's actual sales locations and marketing efforts.

Determining the plaintiffs' respective geographic trade areas for multi-engine aircraft is another matter. As regards White Industries and Model 402A aircraft, I find that its relevant area of competition was in fact nationwide, given the extraordinary marketing effort the company undertook with respect to those planes (direct mail advertising to all air taxi and commuter airline companies in the country, together with installation of a WATS line and direct telephone calling of every person who had received a direct mailing, as well as most of the FBOs and a great many individual aircraft owners across the country). I cannot make the

---

**33.** I do not quarrel with the *theory* that a sufficient amount of price advertising *could* generate such standards; the evidence simply does not convince me that this occurred on the sort of continuing, generalized basis plaintiffs suggest. In fact, plaintiffs' own computer generated summaries reflect a wide variation in resale prices for the same model of aircraft. Admittedly, this could be based in part upon how those planes were equipped, but that further variable hardly helps prove plaintiffs' point.

same finding with respect to White's other multi-engine aircraft, however, or with respect to any of Carthage Airways' multi-engine aircraft. As to the latter categories, while it is clear the relevant trade area would have been materially in excess of that for single engine aircraft of any model, the evidence does not permit me to determine how much so; I am simply left with a market area extending to some undefined point more than 150 miles from the point of operation. How this lack of more precise information will affect matters remains to be seen.

■ The other half of the equation, of course, involves determining the geographic area in which Cessna distributors made end consumer sales.[34] If the geographic area in which a Cessna distributor was thus marketing overlapped in any more than a marginal fashion the geographic trade area of either plaintiff, I will treat the requisite fact of competition as shown.

Unfortunately, once again plaintiffs' theory of a nationwide market, coupled with their reliance upon "Trade-A-Plane" advertising and their expert's opinions in that connection, leave me little more than bare bones with which to work. In fact, I have nothing at all except the location of such sales, and those with respect to only three of the Cessna distributors [35]—certainly relevant information, but hardly all that might be useful.

The information which does exist is shown in Appendix A to this opinion. Capsulized briefly, it reflects, with respect to end consumer sales of single engine aircraft by Aviation Activities, Inc.—the only Cessna distributor for whom such information exists, see Appendix A—that 10 of 14 such sales (71%) occurred within approximately 100 miles of that company's offices in Valparaiso, Indiana, one at approximate-

ly 200 miles, one at approximately 275 miles, one at approximately 300 miles, and one at approximately 600 miles. If one excludes the last such sale as representing the sort of aberrant item referred to by Professors Areeda and Turner, see II Areeda & Turner, supra at 357–58, it is obvious, given no more than this sparse information, that the geographic area in which Aviation Activities was effectively marketing single engine aircraft to end consumers extended no more than a radius of approximately 300 miles from Valparaiso, Indiana. This is wholly insufficient to show the fact of geographic market competition with Carthage Airways regarding single engine aircraft; and while that radius does overlap marginally (in one sparsely populated sector of north central Missouri) the 150 mile radius of White Industries' single engine aircraft marketing area, I conclude—particularly since the closest end consumer sale by Aviation Activities was actually approximately 150 miles distant from the furthest reach of White Industries' 150 mile radius—that this area of theoretical market proximity is in fact too marginal to support a showing of actual geographic market competition. See 5 Von Kalinowski, supra at 30–74 ("mere fringe or marginal competition is usually not sufficient to satisfy the competitive effects requirement of Section 2(a)").

The situation with respect to multi-engine aircraft—excluding for the moment 400 series aircraft—is even more problematical, given the paucity of end consumer sales with which to work. Again, Aviation Activities is the only Cessna distributor shown to have made such sales: two in number, one at a distance of approximately 260 miles, and one at a distance of approximately 950 Miles (see Appendix A). This information is actually too sparse to be particularly meaningful. When, however, I consider the fact that the multi-engine air-

---

**34.** One might argue that the area in which a distributor made aircraft sales of any kind should be the relevant standard. There is, however, an obvious potential difference between the geographic area in which a distributor, dealing with its own or with other dealers, might expect to market aircraft for resale, and the area involved when that distributor deals with at least some kinds of end consumers. Lacking

any testimony on the subject, I am unwilling simply to assume that the two areas are co-extensive.

**35.** Aviation Activities, Inc., of Valparaiso, Indiana; Southaire, Inc., of Memphis, Tennessee; and Florida Aircraft Distributors, Inc., of Ft. Lauderdale, Florida.

craft geographic market areas for both Carthage Airways and White Industries (other than White's 402A aircraft) were postulated as being materially in excess of a 150 mile radius, and the additional fact that the respective trade areas of all three parties would, if extended only a distance of 150 miles over their respective marketing areas for single engine aircraft, overlap significant population centers (including the St. Louis metropolitan area), I conclude that the fact of geographic market competition as between both Carthage Airways and White Industries on the one hand, and Aviation Activities on the other, regarding multi-engine aircraft other than 400 series aircraft, is sufficiently shown.

As to 400 series aircraft, the answer comes more easily. With White Industries' 402A aircraft, the relevant competitive market area has in fact been found to be nationwide; hence any sales by Cessna distributors to end consumers within a reasonably approximate time frame will be sufficient to show the fact of geographic market competition. Nine such sales are shown (*see* Appendix A): four by Aviation Activities (three to a customer in Washington, D.C., and one in Odessa, Texas), three by FAD (all to the same customer, located in Fort Lauderdale, Florida), and two by Southaire to a customer in Memphis, Tennessee. Further, with respect to other 400 series aircraft, the end consumer sales by Aviation Activities—again the only Cessna distributor shown to have made such sales (two in Cincinnati, Ohio, one in Los Angeles, California, and one in Atlanta, Georgia) —clearly suggest (as one would expect given the increased cost, flight range and relative sophistication of such aircraft) a competitive geographic market area considerably in excess of that for other multi-engine aircraft. Whether Aviation Activities' market area for these planes was actually nationwide is questionable, but it seems clear that it would have encompassed the area in which Carthage Airways and White Industries might reasonably have expected to sell them.

The net result of the foregoing, obviously, is a finding that Carthage Airways and White Industries have shown that they were, more likely than not, "in geographic competition" with Aviation Activities in connection with end consumer sales of contemporaneously purchased models of multi-engine aircraft during the relevant time period (for White Industries, 1969 Model 402As; for Carthage Airways, 1969 Model 337s and 421As), and that White Industries was, in connection with such sales of 1969 402A aircraft, more likely than not competing geographically with FAD and Southaire as well.

### F.

### *"Competitive Injury" under § 2(a)*

The final element required for a § 2(a) violation is that there be a "reasonable possibility that [the] price difference [in question] may harm competition." *See Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983). Given the relative magnitude of the price advantage which Cessna distributors enjoyed in their acquisition of Cessna aircraft, it would appear that this element is also shown.

True, as discussed in Section G. *infra*, I am unable to find any actual diverted sale with regard to either plaintiff. Nor is there any real evidence that a reduction in either plaintiff's profits occurred as a result of that pricing differential, whether from a loss of sales to distributors or from a lowering of resale prices to meet competition from distributors. "Actual injury," however, as separately required for any antitrust damages claim by § 4 of the Clayton Act, 15 U.S.C. § 15, is not the issue at this point. *Falls City Industries*, 460 U.S. at 434–35, 103 S.Ct. at 1288–89; and *cf. J. Truett Payne Co.*, 451 U.S. at 561–62, 101 S.Ct. at 1926–27. The immediate question, instead, is simply whether Carthage Airways and White Industries have established a prima facie case of § 2(a) "injury to competition" so as to require—at least for purposes of *that* statute, if analyzed alone—that defendants assume their burden of defense. *See Falls City Industries*, 460 U.S. at 434–35, 103 S.Ct. at 1288–89.

In view of the Supreme Court's recent reaffirmation of the *Morton Salt* doctrine, *see Falls City Industries,* 460 U.S. at 435, 103 S.Ct. at 1289 (for § 2(a) purposes, "injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time"), that much seems clear. Here, the 5 (or 6)% purchase price differential in question must be taken as "substantial," given the general keenness of competition and low profit margins experienced in the general aviation aircraft sales industry, *see generally* Von Kalinowski, *supra* § 31.01, at 31–44 to 31–50, 31–61 to 31–66, and cases cited, or, as alternatively measured, in the sense that it was sufficient in amount to "influence" the competing parties' resale prices, *see FTC v. Morton Salt Co.,* 334 U.S. 37, 47, 68 S.Ct. 822, 828, 92 L.Ed. 1196 (1948). So too must the duration of that pricing differential be taken as meeting the requirements of *Morton Salt*—it existed for at least fifteen years, and encompassed all of the time that Carthage Airways and White Industries were Cessna dealers.

### G.

### ACTUAL INJURY

As indicated by the above comments, White Industries and Carthage Airways have managed—with occasional faltering, to be sure—to satisfy the elements of § 2(a) of the Robinson-Patman Act itself. Since their only remaining claim is for damages, however, that showing is not enough; they must also establish, as a part of their liability case, "actual injury" resulting from that violation. 15 U.S.C. § 15; *J. Truett Payne Co.,* 451 U.S. at 562, 568, 101 S.Ct. at 1927, 1930; *Chrysler Credit Corp. v. J. Truett Payne Co.,* 670 F.2d 575, 581–82 (5th Cir.1982) (on remand), *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982). On that issue, the claim dissolves.

Actual injury cannot simply be inferred from the fact of price discrimination, even if the discrimination is substantial. *J. Truett Payne Co.,* 451 U.S. at 561–62, 101 S.Ct. at 1926–27. Instead, it will ordinarily be necessary to show a loss of profits or diverted sales which can be causally linked to the violation. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.,* 756 F.2d 1467, 1480 (10th Cir.1985); *Olympia Co., Inc. v. Celotex Corp.,* 597 F.Supp. 285, 291–92 (E.D.La. 1984); *Double H Plastics, Inc. v. Sonoco Products Co.,* 575 F.Supp. 389, 400–01 (E.D.Pa.1983); III Kintner and Bauer, *supra* at 657. Here, unfortunately, plaintiffs have made no real effort to show either, and instead again rely for the most part upon general economic theories advanced by their economist.

I find those opinions, unpersuasive. First, even the general theory behind the opinions is fatally flawed, at least as far as the law and the facts of this case are concerned. The theory begins with a premise that there was in fact a single, nationwide market for the sale of Cessna aircraft (something I have found to be unsupported by the evidence); proceeds with a further premise that a sale by a Cessna distributor to any person or entity other than a contracted dealer of *that* distributor represents a sale made "in competition" with every zone or contracted dealer in the United States, even if the sale is to another zone dealer, a contracted dealer of another distributor or an independent dealer (something contrary to both the law and the evidence); adds yet another premise to the effect that any sale by a so-called "captive dealer" of a Cessna distributor constitutes a sale by the distributor in competition with all zone and other contracted dealers (again, something unsupported by either the law or the evidence); and concludes with the general proposition that the result of all such sales, given the purchase price differential available to distributors, was to depress, nationwide, the profits of the "average" zone or contracted dealer by at least the amount of the "average" distributor mark-up on such sales—a proposition which simply cannot be accepted, given the failure of so many of its bases. Second, as may be obvious, even if the general theory was acceptable it tells me only what may have happened to the hypothetical "average" Cessna dealer; as the economist himself finally admitted, it does not tell me that a particular dealer in fact suffered

injury. In sum, whatever role general economic theories might play in proving the fact of injury in Robinson-Patman cases, the effort fails here.

Nor does the proof in this case satisfactorily demonstrate a loss of profits by White Industries or Carthage Airways, *caused by violations of the Act.* I do have generalized, conclusory testimony that both operated unprofitably in selling aircraft throughout their respective periods as zone dealers (and in the case of Carthage Airways, while it was a contracted dealer as well), and data reflecting that many planes ultimately sold by them were sold at a loss. Whether that general unprofitability of business was caused in any part by violations of the Act, however, or instead was caused by other factors, the evidence does not tell me. Plaintiffs made, for example, no effort at establishing profit comparisons with others who operated both during and before or after the period of the business practices in question. *Compare Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 257–60, 66 S.Ct. 574, 576–78, 90 L.Ed. 652 (1946). Furthermore, the evidence reflects that both plaintiffs suffered losses on their sales of single engine aircraft; yet, so far as the evidence shows, those were not sales affected by competition from any Cessna distributor. And, on the other hand, I do know that the mid–1969 to 1971 time frame (which encompasses part of White Industries' time of operation as a zone dealer and much of Carthage Airways' time of "active" operation as a dealer) was a period of serious economic recession in the general aviation aircraft industry. In addition, the evidence reflects that neither White Industries nor Carthage Airways was experienced in the type of dealer operation it attempted to maintain during this period, and that in fact both made rather serious errors of business judgment with respect to their inventory practices during that period. White Industries, for instance, attempted to "corner the market" on 402A series aircraft by purchasing six of the highly expensive, newly introduced planes, and in doing so both saddled itself with a significant debt service problem and with an inventory of aircraft it had no experience selling—problems which were exacerbated when Cessna ultimately produced more of the aircraft than anticipated.[36]

■■■ Admittedly, a plaintiff attempting to prove the fact of actual injury in an antitrust case is not required to exhaust all possible alternative sources of injury in order to fulfill his burden. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969). In fact, once a violation of the operative statute (here, § 2(a)) is shown, a plaintiff need only prove that the violation is a material cause of his injury. *Bohack Corp. v. Iowa Beef Processors, Inc.,* 715 F.2d 703, 710–11 (2nd Cir.1983). Nonetheless, the finder of fact must be able to determine that the alleged injury is, more likely than not, causally linked to that violation. Here, given the other factors mentioned above, all of which are in evidence and cannot be ignored, I am unable to reach that conclusion with regard to a loss of profits, as such, by either plaintiff. *Compare Richard Short Oil Co., Inc. v. Texaco, Inc.,* 799 F.2d 415, 421 (8th Cir. 1986).

Finally, the evidence fails to reflect any sale which I can find was actually diverted from either plaintiff as a result of any violation of the Act. In fact, the evidence does not reflect any sale by a distributor to a customer with whom Carthage Airways had ever had dealings or communications, and only three with whom White Industries had dealings or communications.[37]

---

**36.** Carthage Airways apparently made a similar, although more diversified mistake, purchasing and carrying a larger inventory of expensive aircraft than would make good business sense for a dealer of its size and location, *see* Love testimony; a point which Ingram himself appears to have accepted.

**37.** I do not suggest that a seller must always have had actual communications with a buyer in order to show diverted sales. Presumably, in some circumstances a simple downturn in sales might suffice. However, that sort of evidence is lacking here. Without one sort of proof or the other, or some comparable approach, it is difficult to see how such diversions could be shown.

Of those three purchasers who acquired aircraft from a distributor, with whom White Industries also had communications, two may be dealt with rather quickly. As to Florida Airlines, the evidence tells me only that Terry White had a "contact" at some unspecified time in 1969, without evidence even that a price was quoted. As to Priority Air Dispatch, I know only that at some unstated time (even the year is unidentified, although presumably it was 1969) White "quoted prices." What those prices were is unknown, although the testimony does reveal that in "early 1969" White Industries—apparently in the belief that it had cornered the market on 402A aircraft—was generally seeking a 12% mark-up on those planes, as opposed to the 6% mark-up it ordinarily sought on new aircraft. I note that this was not an especially competitive pricing structure, particularly since White's effort at mini-monopolization had failed, and might in and of itself have been discouraging to a prospective buyer. In addition, the actual sales to Priority Air Dispatch were made through a third party—apparently a broker—with whom White had no communications at all. Further, all the aircraft ultimately purchased by Florida Airlines and Priority Air Dispatch were equipped a good bit differently than any 402A aircraft White Industries had for sale; a matter of no small significance, since the evidence suggests that buyers of this sort of aircraft often had highly specific equipment requirements.[38] Given these points, together with the fact that White Industries had no prior dealings with either of the two companies, and the fact that I have not the least idea what actually motivated either company to purchase when and where it did, I must and do conclude that neither has been shown to be a purchaser diverted from White Industries by virtue of anything causally linked to a violation of the Robinson-Patman Act. It is *possible*, of course, that such was the case, but that bare possibility hardly makes the point more likely than not.

The evidence regarding Sun Airlines is only slightly more developed. Frank Terry White's testimony was that he had conversations with Sun personnel over a two month period in the winter or early spring of 1969 (the first conversation occurred at some point prior to March 17, 1969), and quoted prices on five different 402A aircraft. Apparently discussions ended at that point. In late May of 1969, Sun purchased two 402A aircraft from Southaire at dealer cost.

It is clear, of course, that dealer cost prices were prices White Industries could not profitably have matched. It is considerably less than clear, however, that the above facts reflect a sale diverted from White Industries by virtue of those prices. There is, for example, no indication that White Industries had ever had any prior relationship with Sun, or even any prior dealings. Neither is there any indication that Southaire's discussions with Sun overlapped those between Sun and White. Indeed, I do not even know what the general substance or tenor of the discussions between White and Sun may have been, much less what White's "quoted prices" were or whether actual price negotiations took place—all gaps of some significance given the potential discouraging effect of the 12% mark-up price White was generally quoting at that time. Furthermore, Sun had very particular equipment specifications for the aircraft it wished to purchase—specifications that none of White Industries' 402A aircraft could meet or, except in two instances, even be modified to meet.[39]

---

**38.** Florida Airlines, for example, did not want their planes equipped with Cessna avionics or autopilot, and did not want dual instruments, twin doors, de-ice propellors, an auxiliary fuel system or an oxygen system. Each of White Industries' 402A aircraft had Cessna avionics, de-ice propellors, auxiliary fuel system, oxygen system and twin doors. Some of these items on White Industries' planes could have been modified, but it would have been prohibitively expensive to remove others, and totally impracticable to change twin doors to single doors.

**39.** Sun's specifications called for aircraft without Cessna avionics, and with de-ice equipment sold separately rather than installed. All but two of White Industries' 402A aircraft had complete, installed de-ice systems. The testimony was that it would be impractical to attempt to remove those de-ice systems.

Whether discussions on the subject of modification took place, or instead whether Sun simply determined that it had no interest in planes that did not meet its equipment requirements, is again unknown.

To summarize, I am unable to say with any degree of assurance that Southaire's pricing had any causal relationship to Sun's decision not to purchase from White Industries. Certainly, of course, it is *possible* that it did, but the lack of any evidence on the subject, coupled with the presence of equally likely contrary possibilities, leaves the matter no further advanced than the realm of speculation.

I conclude that both White Industries and Carthage Airways have failed to show, by a preponderance of the credible evidence, any actual injury caused by a violation of the Robinson-Patman Act. Their claims under that statute must accordingly be dismissed.

### V.

### THE SHERMAN ACT CLAIM

■ Given the result reached with plaintiffs' Robinson-Patman claim, there is probably a short answer to at least portions of their partially parallel Sherman Act § 1 claim: even if that claim might otherwise be viable, there has been a failure to prove actual injury in connection with it. There are, however, more fundamental difficulties as well.

The claim is apparently premised upon a theory that there was a vertical conspiracy between Cessna and the Walston distributors (Aviation Activities, Inc. and Southaire, Inc.), the object of which was to extend discriminatory discounts and allowances to those distributors. As the Ninth Circuit pointed out in *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 886–87 (9th Cir.1982), however, such an agreement cannot form the basis for a Sherman Act claim—at least in a situation of alleged secondary line discrimination such as this one—unless the intent of the arrangement was to exclude others from the buyer's market. Further, even if there is proof of such an intent there is no *per se* violation;

the situation must be tested by the rule of reason (a balancing of the competitive evils of the restraint against the anti-competitive benefits asserted on its behalf). *Id.*

Here, as in *Zoslaw*, there is no credible evidence—direct or circumstantial—of any arrangement which contemplated plaintiffs' exclusion from a distributor's market for the resale of new, current aircraft, even if that market is assumed to include end consumer sales. To the contrary, the evidence reveals no more than the fact that Cessna and the distributors in question entered into the same Cessna distributorship contract that all Cessna distributors signed—a contract, it may be noted, that did not restrict either party with regard to where or with whom sales could be made. It may be, of course, that the distributors in question undertook to sell in the end consumer market, and in doing so realized a competitive advantage over dealers, but in view of Cessna's efforts at establishing its zone dealer system it approaches the ridiculous to suggest that it sought, at the same time, to "exclude" those dealers from the very market they were to serve. In short, while the evidence in this case may reflect a distribution system which gave Cessna distributors a price advantage if they in fact sold in the end consumer market, that evidence falls far short of supporting a Sherman Act claim.

Neither does the evidence reflect any sort of an agreement or understanding to exclude plaintiffs from the general market for resales to other dealers. Cessna simply granted a larger functional discount to those who were willing to undertake the additional cost and effort of merchandising its products in a wholesale capacity—something that plaintiffs never sought and probably lacked the resources to accomplish in any event. In fact, there is nothing even in the effect of this which is anti-competitive, at least in the sense that it violates the rule of reason.

Nor does the evidence—and this is apparently plaintiffs' real theory—satisfactorily support a finding that there was any agreement or understanding to exclude plaintiffs from the resale market in new, non-current

aircraft. The testimony, instead, reveals no more than that at the end of each current model year, Cessna offered its remaining inventory of that year's aircraft to distributors on a close-out basis, and if all such aircraft were not disposed of in that way then on a "best-bid" basis. True, there is no showing that the same offers were made to zone dealers, but neither is there any showing that zone dealers in general, or plaintiffs in particular, were ever precluded from buying such aircraft. Indeed, White Industries bought several, albeit at dealer prices. And, more importantly perhaps, even if one might find some evidence of an exclusionary effect in all this, I am unable to conclude that the same represents an unreasonable restraint on trade as measured by the rule of reason. At worst, Cessna simply offered and sold most such aircraft to the class of buyer best able to purchase them in quantity—something inoffensive in and of itself, which in turn allowed Cessna to compete effectively with other manufacturers by clearing out old inventory after it introduced new aircraft, and (according to the testimony) stimulated aircraft sales of all sorts at all levels. I find no violation of the Sherman Act in this.

## VI.

### DECERTIFICATION OF THE CLASS

The fact that the designated class representatives have lost their own claims does not, itself, necessarily require a decertification of the class. *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 406 n. 12, 97 S.Ct. 1891, 1898 n. 12, 52 L.Ed.2d 453 (1977); *Scott v. City of Anniston, Ala.*, 682 F.2d 1353, 1356–57 (11th Cir.1982); *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir.1982), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982). Where, however, the class certification is found to have been improvident because the basic requirements of Rule 23 cannot be met, the court may—indeed must, to my thinking—enter a decertification order. *Valentino v. U.S. Postal Service*, 674 F.2d 56, 66 n. 12 (D.C. Cir.1982); *Eggleston v. Chicago Journey-*

*men Plumbers', Etc.*, 657 F.2d 890, 896 (7th Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982); *Stastny v. Southern Bell Tel. and Tel. Co.*, 628 F.2d 267, 275–76 (4th Cir.1980). This is so even if the finding is not made until during or at the conclusion of the trial on the merits, *Stastny v. Southern Bell Tel. and Tel. Co.*, 628 F.2d at 275–76; and of course should be equally true where, as here, the proceedings have been bifurcated.

From what has been said in the preceding sections of this opinion, it should now be clear that the class certification order in this case was improvident or at least, with the disappearance of the claim for injunctive relief, is now. Rule 23(a), of course, requires (among other things) that there be "questions of law or fact common to the class." Rule 23(b)(3) in turn requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, ..." Here, by contrast, the individual questions overwhelm any common ones. For example, each class member, in order to prevail on a Robinson-Patman claim, would find it necessary to show, on an individual basis, (a) the immediate principal purpose for which it purchased its aircraft; (b) the geographic market area in which it actually competed for aircraft sales to end consumers during the time in question; (c) whether any Cessna distributor actually competed for aircraft sales to end consumers in that same geographic area during the time in question; and (d), the fact of actual injury (no small task, as the present case illustrates). In fact, of the issues which have been contested in this case, there are none which could even profitably be treated on an "issues only" class basis under Rule 23(c)(4). I conclude, accordingly, that defendants' motion to decertify the class must be granted.

Elementary principles of fairness suggest that notice of the court's ruling should be given to the absent class members so that they may determine what further individual courses of action they wish to pursue. Class counsel will be ordered to pre-

pare a suggested form of notice; defendants of course will be given the opportunity to comment.

## VII.

### ORDERS

For the foregoing reasons, it is hereby

ORDERED that judgment shall be entered in favor of defendants The Cessna Corporation and Cessna Finance Corporation on all the claims of plaintiffs White Industries, Carthage Airways and Eugene Ingram as asserted in this case; and it is further

ORDERED that the original class certification order entered in this case on October 9, 1973, as modified by the court's orders of June 5, 1974, November 24, 1978 and August 22, 1983, is herewith vacated, and such class is hereby decertified; and it is further

ORDERED that class counsel shall, within thirty (30) days of the date of this Order, prepare, file and serve a suggested form of notice to absent class members, advising of the court's action in decertifying the class and further advising said absent class members of their right to proceed individually if they wish; and it is further

ORDERED that defendants shall have fifteen (15) days from and after the filing of the suggested form of notice called for by the preceding paragraph, within which to comment on the same; and it is further

ORDERED that each party shall bear its own taxable costs herein incurred and expended.

### APPENDIX A

End Consumer Sales by Cessna Distributors[40]

A. Aviation Activities, Inc. (A Cessna Distributor located in Valparaiso, Indiana); single engine aircraft:

| | Aircraft Model | Date of Sale | Purchaser |
|---|---|---|---|
| 1. | 150 | 2/28/70 | Swanke Aviation, Rochelle, Illinois (flight school) |
| 2. | 150 | 7/15/70 | Flight Tech, Inc. Chicago, Illinois (for lease to flight school) |
| 3. | 150 | 11/30/70 | B & W Aviation, Chicago, Illinois (flying club) |
| 4. | 171 | 3/31/70 | B & W Aviation, Chicago, Illinois (flying club) |
| 5. | 172 | 3/31/70 | Ralph Sherrill, Parkridge, Illinois (for lease to flight school) |
| 6. | 172 | 9/4/69 | Magnolia Airport, Magnolia, Ohio (for use in flight school) |
| 7. | 172 | 6/13/72 | Max C. Emory, Bay City, Michigan (individual, for use) |
| 8. | 172 | 5/13/68 | Aviation Training Enterprises, Chicago, Illinois (flight school) |
| 9. | 172 | 5/18/68 | Aviation Training Enterprises, Chicago, Illinois (flight school) |
| 10. | 172 | 7/31/68 | Aviation Training Enterprises, Chicago, Illinois (flight school) |
| 11. | 172 | 8/29/68 | Aviation Training Enterprises, Chicago, Illinois (flight school) |
| 12. | 172 | 7/26/68 | Chicago Area Pilots Association, Chicago, Illinois (flying club) |
| 13. | 172 | 11/12/68 | Dan Chislom, Philadelphia, PA. (individual, for use) |
| 14. | 177 | 12/13/71 | Robert G. Zimmer, Carbondale, Illinois (individual, for use) |

B. Aviation Activities, Inc.; multi-engine aircraft:

| | | | |
|---|---|---|---|
| 15. | 210 | 8/31/70 | John & Ann Huttig, Orlando, Florida (individuals, apparently for use) |
| 16. | 337 | 7/24/69 | Centurion Corporation, Cincinnati, Ohio (construction company) |
| 17. | 401 | 11/27/68 | Centurion Corporation, Cincinnati, Ohio (construction company) |
| 18. | 402A | 4/22/69 | Priority Air Dispatch, Washington, D.C. (contract air carrier) |
| 19. | 402A | 6/26/69 | Priority Air Dispatch, Washington, D.C. (contract air carrier) |
| 20. | 402A | 7/22/69 | Priority Air Dispatch, Washington, D.C. (contract air carrier) |
| 21. | 402A | 3/27/70 | Wooly Tool and Manufacturing, Inc., |

**40.** All of the alleged competitive single engine aircraft sales by Southaire and FAD have been eliminated, as well as most of the multi-engine sales by Southaire, FAD and Aviation Activities, either because the sale has not been shown to have been made to the ultimate purchaser or (as in most instances) because that ultimate purchaser has not been shown to have purchased for the immediate principal purpose of use.

Odessa, Texas
(apparently a manufacturing company)

| 22. | 414 | 7/18/70 | Hassen Motors, Inc., Cincinnati, Ohio (apparently a business unrelated to aircraft sales) |
| 23. | 421A | 8/30/69 | Teledyne, Inc., Los Angeles, California (an engine manufacturing company) |
| 24. | 421B | 1/26/71 | Big Creek Farms, Atlanta, Georgia (apparently a business unrelated to aircraft sales) |

C. Southaire, Inc. (a Cessna Distributor located in Memphis, Tennessee); multi-engine aircraft:

| 25. | 402A | 5/23/69 | Sun Airlines, Memphis, Tennessee (commuter airline) |
| 26. | 402A | 5/23/69 | Sun Airlines, Memphis, Tennessee (commuter airline) |

D. Florida Aircraft Distributors (a Cessna Distributor located in Ft. Lauderdale, Florida); multi-engine aircraft:

| 27. | 402A | 8/20/69 | Florida Airlines (Hill Leasing Corporation), Ft. Lauderdale, Florida (commuter airline) |
| 28. | 402A | 9/15/69 | Florida Airlines (Hill Leasing Corporation), Ft. Lauderdale, Florida (commuter airline) |
| 29. | 402A | 10/31/69 | Florida Airlines (Hill Leasing Corporation), Ft. Lauderdale, Florida (commuter airline) |